Allen, J.
 

 The plaintiff in error, the Ohio Fuel Gas Company, urges certain subsidiary points which we shall discuss first. It moved for an order dismissing the action and to return a judgment “in its favor against the plaintiffs, C. P. Gongwer, J. B. Lentz, Guy B. Murray, C. N. Bohn, W. B. Marlowe, Boss Markell,
 
 *412
 
 D. B. Hammer, J. J. Graska, Boy Shaw, P. B. Kirkton, and Lester Meyers, for the reason that there is no evidence in this case showing that one or all of these people, or any one of them, owns the interest alleged in the petition, ’ ’ or any interest. The court overruled the motion, and this is claimed to constitute reversible error.
 

 Plaintiff in error urges that there is no scintilla of competent evidence in the record that plaintiffs below owned any interest whatsoever in the lease in question, but inasmuch as the allegations of ownership of the various interests in the lease made in the petition are not denied by the gas company, no proof was required upon that point, and this objection is overruled.
 

 The principal grounds of error presented are that the Court of Appeals erred:
 

 (1) In affirming the judgment of the trial court, which refused to permit the Ohio Fuel Gas Company to prove that the contract sued on had been modified by a later agreement between the known and disclosed parties thereto.
 

 (2) In affirming the overruling of the motion of the gas company for judgment in accordance with the special findings of fact, duly made and returned in writing by the jury pursuant to request therefor.
 

 (3) In affirming judgment for damages as entered by the trial court in accordance with the general verdict of the jury, the same being excessive due to error on the part of the jury in fixing the amount of its general verdict.
 

 (4) In affirming the trial court’s rulings admitting evidence by the plaintiffs below as to whether other wells than those referred to in the petition and located one-half mile or more distant from the Boy Shaw well and on property other than that adjoining the Boy Shaw 15 acres would drain the Boy Shaw well.
 

 Did the Court of Appeals err in affirming the judgment below, although the trial court refused to permit
 
 *413
 
 the plaintiff in error to prove the alleged modification of the contract sued on by a later agreement between the gas company and Hulse and Kundtz?
 

 This objection as to rejection of evidence is untenable. The pleadings raised no issue of modification of the contract. As the contract was a written contract covering ten years, any modification thereof to be enforceable under the statute of frauds was required to be in writing. Section 8621, General Code. Mr. Clyde C. Phillips, manager of transmission of the defendant company, describes the so-called contract as an “arrangement”, “pretty much a verbal arrangement” of which the company secured “verbal approval, although we had correspondence.” Hence the court did not err in excluding this testimony.
 

 Did the Court of Appeals err in affirming the overruling of the motion of the plaintiff in error for judgment, as it claims, in accordance with the special finding of facts?
 

 Under Section 11464, General Code, in effect at the time this action was instituted, when a special finding of fact is inconsistent with the general verdict, the former shall control the latter, and the court may give judgment accordingly; and it has been held by this court recently, in
 
 Central Gas Co.
 
 v.
 
 Hope Oil Co.,
 
 113 Ohio St., 354, 149 N. E., 386:
 

 “2. Where special findings of fact returned by a jury are clearly irreconcilable upon the record with the general verdict, it is error for the trial court to refuse to set aside and disregard the general verdict, in so far as such special findings are inconsistent therewith, and to give judgment accordingly.”
 

 The same rule is laid down in the syllabus in the case of
 
 Columbus, Delaware & Marion Electric Co.
 
 v.
 
 O’Day, Admx.,
 
 123 Ohio St., 638, 176 N. E., 569.
 

 The plaintiff in error contends that the special finding of facts by the jury is inconsistent with the general verdict.
 

 
 *414
 
 The first two items of breach of contract alleged in the petition were taken from the consideration of the jury by the trial court, and only the following three items were submitted, charging that the defendant
 

 “(c) Failed to take the gas provided in said contract to be taken by it during the summer months of 1928, but instead said defendant closed the gate of said ‘Shaw’ well and blindplated the line thereto on or about May 1, 1928, and thereby caused the gas produced at said well to be completely shut off from delivery into its gas lines until on or about October 1, 1928.
 

 “(d) Failed to take the gas provided in said contract to be taken by it during the summer months of 1929, but instead said defendant closed the gate to said ‘Shaw’ well and blindplated the line thereto on or about May 1, 1929, and thereby caused the gas produced at said well to be shut off from delivery into its gas line until on or about October 1, 1929.
 

 “(e) Permitted the gas produced from the Brown No. 1 and Ringler No. 1 wells to be delivered into its gas line at all times hereinbefore mentioned when said ‘Shaw’ well was shut off from delivery.”
 

 At the trial, at the request of the Ohio Fuel Gas Company, the court submitted to the jury two special interrogatories, which with their answers, are as follows :
 

 “No. 1. Does the jury find as a fact that the marketing of gas from the Roy Shaw well and the J. E. Ringler well was begun on the same day?
 

 “Answer: Yes.
 

 “No. 2. If the jury should find from the evidence the fact to be that The Ohio Fuel Gas Company violated or breached the agreement of October 24, 1927, by not taking enough gas from the Roy Shaw well from November 24, 1927 to October 15, 1929, then and in case the jury so finds, how much gas did said gas
 
 *415
 
 company take from said well during said time and how much gas should it have taken during said time?
 

 “Answer: 50,897 M amount of gas taken.
 

 “Answer: 62,713 M amount of gas it should have taken.”
 

 The two interrogatories were clearly responsive to items (c) and (d) above given, and not to item (e), which alleged discrimination in the shutting off of the Shaw well in favor of other wells from which the Ohio Fuel Gas Company was marketing gas from the adjoining property. This clearly was a separate specification of breach of the contract heretofore set out.
 

 Hence the answers to the interrogatories were not conclusive of the entire case alleged in the petition. The special findings are not inconsistent with the general verdict, and we overrule this contention of the plaintiff in error.
 

 Did the Court of Appeals err in affirming the judgment for $6,700 for damages, as entered by the trial court in accordance with the general verdict of the jury, upon the ground that the verdict was excessive?
 

 This raises the question whether there is evidence in the record tending to show that there was a production of gas in such quantity as was evidently found by the jury from the Brown No. 1 and the Ringler No. 1 wells at times when the Shaw well was shut off from delivery and that this operation drained the Shaw well to the damage of the plaintiff.
 

 The record tends to show that the Shaw well was closed in, the gates were closed, and the blindplate was put into the line from June 1, 1928, until September 21,1928; that the Shaw well was closed in again during the summer of 1929, about May 1, 1929, and not reopened for the greater part of the summer. The record tends to show that the Shaw well, while it was completed March 9, 1927, was capped in from the time that it was completed and the gas in the well was not sold or marketed or used until after the execution
 
 *416
 
 of the contract for the sale of gas to the Logan Gas Company, which was signed October 24, 1927. The record tends to show that the Shaw well commenced to deliver gas into the lines of the Logan Gas Company November 24, 1927. The record shows that the Shaw well was approximately 500 feet distant from the Brown No. 1 and the Ringler No. 1 wells, and that no offset well was drilled to prevent draining from the Shaw well into these two wells. The record presents testimony tending to prove that all of these wells tapped the so-called Clinton sand, that the depth of the Shaw well was 2,339 feet, and that the depth of the Brown No. 1 well was 2,336 feet. The record tends to show that the initial rock pressure of the Shaw well was 925 pounds, with an open flow volume per day of two and a quarter million cubic feet. The record tends to show that the Brown wells and the Ringler No. 1 well were “operating and delivering gas,” while the Shaw well was shut off in the summers of 1928 and 1929. The record tends to show that the depth of the Clinton sand struck at the Shaw well was ten feet, and that the depth of the Clinton sand in the Brown No. 1 well was five feet. It is conceded that the Brown No. 1 well and the Ringler No. 1 well were not metered, and the Shaw well was metered. The record shows from the company’s own books that 72,270,000 feet of gas were produced by the Brown No. 1 well the first 73 days that it was on the line. The record tends to show that the Brown No. 1 well and the Brown No. 2 well were capable of draining gas from the Shaw well while it was shut out. The record tends to show that, while the original rock pressure of the Shaw well was 925 pounds, the rock pressure of the Shaw well in the summer of 1929 was 120 pounds, and that this well should have produced 40,000,000 cubic feet of gas for every 100 pounds decrease in rock pressure, but that in the summer of 1929 the Shaw well was much depleted in reference to production.
 

 
 *417
 
 The Shaw well was completed March 9,1927. It was capped in until October 24, 1927, and the Shaw well was hooked up to the gas company’s line in November, 1927. The petition was filed October 14, 1929. If the Shaw well was reduced in rock pressure by 805 pounds from the time that it was completed to the summer of 1929, and if the well should have produced 40,000,000 cubic feet of gas for every ,100 pounds decrease in rock pressure, the well was depleted 320,-000,000 cubic feet of gas during this period. Hence there is testimony in the record tending to show that a considerable amount of depletion of the Shaw well occurred after the contract was in force, as alleged in the petition. At the figure of the Ohio Fuel Gas Company, which concedes a price of eighteen cents .per thousand cubic feet, the damages allowed by the jury were not excessive, based upon this testimony as to the amount of depletion in the well.
 

 It is the contention of the plaintiff in error that this testimony, which appeared in the evidence given by J. E. Eingler, plaintiff below, was incompetent upon the ground that Eingler had not qualified as an expert. It was shown that Mr. Eingler’s business was oil and gas, leasing and producing gas, and that he had been in the business for nine years, and that during this time he had been interested in drilling wells, had drilled wells, and had bought and sold interests in different producing wells, and that his main activity in his business was confined to Ashland county.
 

 Under the circumstances, the objection is not to the competency of the testimony, but to its weight.
 

 Did the Court of Appeals commit reversible error in affirming the trial court’s rulings admitting evidence by the plaintiffs below as to whether other wells than those referred to in the petition, and located one-half mile or more distant from the Shaw well and on property other than that of the Eoy Shaw farm, would drain the Shaw well?
 

 
 *418
 
 The record shows that the plaintiff in error without objection permitted the plaintiffs below to offer testimony as to other wells than those referred to in the petition, the distance of their location from the Shaw well, and other points in connection with the production of these other wells. The record contains much and repeated testimony with reference to other wells than those described in the petition, either offered by the plaintiffs in error or elicited by them on cross-examination, or allowed by them to be given without objection. Under the circumstances the admission of the evidence did not constitute reversible error.
 

 The record does show distinct testimony to the effect that the Brown No. 1 well and the Bingler No. 1 well, which were situated on adjoining properties and only 500 feet distant, would drain the Boy Shaw well, and hence there was evidence in the record tending to establish discrimination in favor of wells from which the Ohio Fuel Gas Company was marketing gas from adjoining property, as covered in section 4 of the contract, heretofore stated.
 

 In view of the charge of the court, the admission of so much evidence upon the point of these other wells, without objection from or at the instance of the plaintiff in error, and in view of the absence of any interrogatory upon this particular point, to show whether the jury considered, in arriving at its verdict, the fact that other wells at a greater distance, namely, 1,500 feet, might drain the Boy Shaw well, we think that no reversible error was committed upon this particular point.
 

 Since the record does show the blindplating of the Shaw well for a considerable period of time, its depletion in production, its reduction in rock pressure, as shown by the company’s records, we conclude that the answer to the second interrogatory given by the jury relates only to items (c) and (d), and that the
 
 *419
 
 larger amount of the verdict was returned for damages shown under specification (e).
 

 There being some evidence in the record to this effect, we overrule the contention of the plaintiff in error.
 

 The judgment of the Court of Appeals will be affirmed.
 

 Judgment affirmed.
 

 Weygandt, C. J., Day, Stephenson'and Matthias, JJ., concur.
 

 Jones, J., dissents from judgment.
 

 Kinkade, J., not participating.